# EXHIBIT 2

FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

M. .. 14 1988 e.pme

ANN A. B.R.H, CLERK
CHARLESTON, S. C.

| | | |
|---|---|---|
| CLEMSON UNIVERSITY and | ) | |
| THE COLLEGE OF CHARLESTON | ) | |
| on behalf of themselves and all | ) | C. A. No. 2: 86-2055-2 |
| others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | CLASS PLAINTIFFS' |
| | ) | MEMORANDUM SUPPLEMENTING |
| vs. | ) | ORAL ARGUMENT IN OPPOSITION |
| | ) | TO KAISER GYPSUM'S MOTION |
| W. R. GRACE & CO., et al., | ) | TO DISMISS |
| | ) | |
| Defendants. | ) | |
| | ) | |

At oral argument, the Court commented on several issues which class plaintiffs believe may be clarified by this Memorandum.

## I
## CLEMSON UNIVERSITY IS A SEPARATE MUNICIPAL
## CORPORATION FROM THE TOWN OF CLEMSON

A.   Clemson University, A Municipal Corporation, Is A
Citizen For Diversity Purposes

During argument, Kaiser Gypsum suggested that plaintiffs were in error about the municipal status of Clemson University, and that the municipality of Clemson was not Clemson University, but the Town of Clemson. Tr. 95. This is wrong. There are two different municipalities — the Town of Clemson and a separate municipality consisting of the land and buildings of Clemson University.[1] Clemson University (the school and not the town)

---

[1]   The municipal corporation created by § 59-119-310, called "Clemson University", is governed by the Clemson University Board of Trustees pursuant to § 59-119-320. In turn, § 59-119-320 gives the Board of Trustees standard powers of a municipality including, inter alia: (1) to "have perpetual

was made a municipal corporation by § 59-119-310.  See also,

Harsco Corp. v. Cisne and Associates, Inc., 45 N.C.App. 538, 263

S.E.2d 43 (1980) (citing § 59-119-310 and holding that Clemson

University is a municipal corporation subject to suit in either

the state court or the federal district court in South Carolina.)

As noted in class plaintiffs' previous memorandum, the United

States Supreme Court has consistently held that municipal

corporations are citizens of the state within the meaning of the

diversity statute, 28 U.S.C. § 1332.  See, e.g., Illinois v. City

of Milwaukee, 406 U.S. 91, 97-98, 92 S.Ct. 1385, 1390 (1972).

Thus, Clemson University's status as a municipal corporation

under § 59-119-310 is determinative of its status as a citizen.

Wright & Miller state the general rule that: ". . . a

political subdivision of a state, unless it is merely an alter

ego thereof, is a citizen".  13B Wright, Miller & Cooper, Federal

Practice and Procedure, § 3602 (1984).  It has been consistently

held that a municipal corporation is a citizen of the state where

_____

control and direct the affairs of such municipal corporation",
(2) to appoint a "recorder" (comparable to a magistrate) to try
cases involving violations of Clemson University's ordinances;
and, under § 59-119-340, to appoint constables ". . . to enforce
obedience to the ordinances of the Board and to the laws of the
state."

The City of Clemson, on the other hand, is entirely separate
and distinct from the municipal corporation of Clemson University
created by § 59-119-310.  The city has a mayor, a six-member city
council elected by the voters in a non-partisan election, and a
city charter.  As shown by the certificate of the Secretary of
State attached hereto as Exhibit A, the town was made a municipal
corporation November 1, 1946.  The city limits of the City of
Clemson do not include that property known as the municipal
corporation of Clemson University described by § 59-119-310.

2

it is located.[2]  "Federal courts generally have held that
municipal entities, such as cities and counties, are to be
considered citizens for diversity purposes rather than the alter
ego of the state for Eleventh Amendment purposes."  4A Wright &
Miller, Federal Practice and Procedure, § 1110 (1987).  While a
non-municipal political subdivision of a state may or may not be
a citizen --- depending on whether it is an alter ego --- the
Supreme Court has repeatedly held that municipal corporations are
citizens for diversity purposes.

In Cowles v. Mercer County, 74 U.S. 118, 19 L.Ed. 86 (1868)
the Supreme Court first announced that a municipal corporation
was a citizen for diversity purposes.  Thereafter, in Loeb v.
Trustees of Columbia Township, 179 U.S. 472, 21 S.Ct. 174, 180
(1900), the Court elaborated:

> When the act of 1888 was passed it was
> the established law that a municipal
> corporation created under the laws of a state
> with power to sue and be sued and to incur
> obligations, was to be deemed a citizen of
> that state for purposes of suit by or against
> it in the courts of the United States.  In
> Cowles v. Mercer County, 7 Wall. 118, 122,
> sub. nom Mercer County Suprs. v. Cowles, 19
> L.ed. 86, 88, this court said:  'It is enough
> for this case that we find the board of

_____

2    With the exception of the unique circumstances of the
District of Columbia, every case plaintiffs have located has held
that municipal corporations are citizens.  The District of
Columbia, of course, is the equivalent of a state in its
geographical territory, and the special rules developed for it
are inapplicable outside of its unique ambit.  See e.g., District
of Columbia v. L. B. Smith, Inc. of Virginia, 474 F.Supp. 894
(D.D.C. 1979) (finding that due to the unique status of the
District of Columbia, the municipal corporation entitled the
District of Columbia is not a political subdivision of the
District but rather is one and the same).

3

supervisors [of the county] to be a corporation authorized to contract for the county. The power to contract with citizens of other states implies liability to suit by citizens of other states, and no statute limitation of suability can defeat a jurisdiction given by the Constitution.'. . . We perceive nothing in that act indicating any purpose of Congress to exclude from the jurisdiction of the circuit courts of the United States suits by or against municipal corporations having authority by the laws creating them to sue or to incur liabilities in their corporate name.

(Citations omitted).

Again, in Port of Seattle v. Oregon, 255 U.S. 56, 41 S.Ct. 237, 242 (1921) the Court stated:

The objection to the jurisdiction of the District Court is clearly unsound. The port, being a municipal corporation under the laws of Washington, is a citizen of that state and could have been sued in the Federal Court. [Citations omitted].

Accord: Illinois v. City of Milwaukee, 406 U.S. 91, 92 S.Ct. 1385 (1972); Moor v. County of Alameda, 411 U.S. 693, 93 S.Ct. 1785 (1973).

The Supreme Court has never waivered from this basic principle first espoused 120 years ago --- that a municipal corporation is a citizen of a state for diversity purposes. The South Carolina statutes leave no doubt that Clemson is a municipal corporation, despite Kaiser Gypsum's erroneous argument that the only municipality was the Town of Clemson.

Having ignored Clemson's status as a municipal corporation, Kaiser Gypsum contended that as a "political subdivision" of the state, an alter ego inquiry must be made. While such an inquiry

4

may be necessary where the "political subdivision" is a non-municipal state agency such as a Park Commission[3], Ports Authority[4], Department of Health and Rehabilitative Service[5], Transportation Authority[6], or a Human Relations Commission[7], an entity's status as a municipal corporation is independently sufficient to find citizenship and no alter ego inquiry is required.  Thus, the fact that Clemson University is a municipal corporation is dispositive of its South Carolina citizenship for diversity purposes.

---

[3]    Ram Ditta v. Maryland National Capital Park and Planning Comm'n, 822 F.2d 456 (4th Cir. 1987) (holding Park Commission was not an alter ego of the state notwithstanding that the Commission was a state agency entitled to sovereign immunity).

[4]    Indiana Port Commission v. Bethlehem Steel Corp., 702 F.2d 107 (7th Cir. 1983) (holding that the Port Commission was not the alter ego of the state and was therefore a citizen of Indiana for diversity purposes.)

[5]    State of Florida (Department of Health and Rehabilitative Services) v. Davis, 616 F.2d 828 (5th Cir. 1980) (invocation of diversity jurisdiction proper by Florida Department of Health and Rehabilitative Services.)

[6]    Morrison-Knudsen Co. v. Massachusetts Bay Transportation Authority, 573 F.Supp. 698 (D.C. Idaho 1983) (holding that the Bay Transit Authority was a citizen within § 1332 despite its status as a state agency.)

[7]    Pennsylvania Human Relations Commission v. U.S. Air, Inc., 615 F.Supp 75 (W.D.Pa. 1985) (Commission is an alter ego of the Commonwealth and therefore not a "citizen" within the meaning of the federal diversity statute).

II
A MUNICIPAL CORPORATION SUCH AS CLEMSON IS A CITIZEN
FOR DIVERSITY PURPOSES EVEN IF IT IS IMMUNE
FROM LIABILITY UNDER STATE LAW

A.    State Immunity and Federal Citizenship Involve
Different Inquires

Kaiser Gypsum argued that Clemson was estopped to argue it was a citizen for diversity purposes because it had claimed tort sovereign immunity in state court.  Tr.73.  This argument confuses the different inquires for diversity citizenship and state immunity.

It is perfectly consistent for Clemson University to be an "alter ego" for the purposes of state sovereign immunity from tort liability, and yet be a citizen for purposes of diversity. South Carolina's judicially created doctrine of sovereign immunity is extremely broad.  For example, it extends to municipal corporations which are undisputedly "citizens" for purposes of § 1332.  As the South Carolina Supreme Court stated in Mullins Hospital v. Squires, 233 S.C. 186, 104 S.E.2d 161 (1958):

> The common-law rule denying liability of municipal corporations in tort was an offshoot of the old maxim, 'The King can do no wrong,' and of its corollary that the sovereign may not be sued without its consent.  The municipality, being an agency of the sovereign, was accorded like immunity, at least against actions based on negligence in the performance of governmental functions.

Id.[8]

---

[8]    In the recent landmark case of McCall v. Batson, 285 S.C. 243, 329 S.E.2d 741 (1985) abolishing sovereign immunity, the South Carolina Supreme Court discussed sovereign immunity as

Neither the diversity statute nor the 11th Amendment depend on state law for their application. The Wright & Miller treatise recognizes this principle:

> . . . the fact that a governmental entity has been given sovereign immunity in its own state courts by state law is not dispositive of federal jurisdiction. State court immunity does not, by itself, mean that an entity is part of the state for Eleventh Amendment purposes, and it will not prevent an individual from securing his rights under federal law in a federal court.

13 Wright, Miller & Cooper, _Federal Practice and Procedure_, § 3524 at 213 (1984). _See also_, _Chicot County, Arkansas v. Sherwood_, 148 U.S. 529, 13 S.Ct. 695 (1893). The treatise emphasizes that state-created immunities are not determinative of citizenship:

> A similar proposition that seems quite clear is that governmental units not covered by the Eleventh Amendment are suable in federal court, even in actions based solely on diversity jurisdiction. Thus, even when a state creates governmental units that it wishes to be immune from suit in federal court, a federal court may disregard its wishes.

_Id._ Accord: _Markham v. City of Newport News_, 292 F.2d 711, 718 (4th Cir. 1961).[9]

---

covering both state and local governments, and the Chief Justice's opinion lists 122 cases which are overruled, including cases involving the State, state-level agencies, towns, counties, school boards, etc. and also including _Hopkins v. Clemson_, 77 S.C. 12, 57 S.E. 551 (1907) _rev'd._ 221 U.S. 636, 31 S.Ct. 654, 55 L.Ed. 890 (1911).

[9] Although consistent with the _Erie_ doctrine a federal court will honor whatever substantive immunities are raised as a defense by the state agency in an action under state law, "[i]t is important . . . to distinguish these state immunity _Erie_

7

### III
### WHOLLY APART FROM ITS MUNICIPAL CORPORATION
### STATUS, CLEMSON IS A CITIZEN FOR DIVERSITY PURPOSES

A.    Clemson Meets The Legal Test For Citizenship

Even if this court chooses to look past Clemson's status as a municipal corporation to whether it is the "alter ego" of the state for diversity purposes, Clemson should prevail. While the diversity and 11th Amendment alter ego inquires are "essentially" the same, the diversity inquiry is, if anything, less exacting. In this respect, the Ninth Circuit's decision in Rutledge v. Arizona Board of Regents, 660 F.2d 1345 (9th Cir. 1981) is instructive.   In Rutledge, the court affirmed the district court's finding that it had diversity jurisdiction over the Board of Regents (i.e. it was a citizen), but dismissed the suit against the Board finding it to be the alter ego of the state for 11th Amendment purposes.

Even if the Eleventh Amendment and diversity tests are considered identical, it is clear that an entity's status as a state agency is not determinative of its alter ego status for purposes of § 1332 or the 11th Amendment.  For example, in Morrison-Knudsen Co. v. Massachusetts Bay Transit Authority, 573 F.Supp. 698 (D. Idaho 1983), the MBTA was held to be a citizen within the meaning of § 1332, despite its status as a state

_____

dismissals from bona fide Eleventh Amendment constitutional questions.  Similarly, federally created immunities such as those given to officers and legislators will be honored by a federal court, but again, these immunities have nothing to do with the Eleventh Amendment." 13 Wright, Miller & Cooper § 3524 p. 214-15 (1984).

agency. Similar conclusions were reached by federal courts with respect to the Southern Pennsylvania Transportation Authority[10], the Pennsylvania Turnpike Commission[11], and the Louisiana Department of Highways.[12]    Cf. Gordenstein v. University of Delaware, 381 F.Supp. 718, 722 n.23 (D. Del. 1974) ("agency" status is not the equivalent of 11th Amendment alter ego status; thus, state decisions finding the University a state agency are inapposite). See also Ram Ditta v. Maryland National Capital Park and Planning Comm'n, 822 F.2d 456 (4th Cir. 1987) (Park Commission is not an alter ego notwithstanding its status as a state agency).

Accordingly, the miscellaneous statutory provisions that evidence nothing more than Clemson's status as a state-assisted school (cited by Kaiser Gypsum in its brief) are irrelevant to determination of its alter ego status under § 1332. That Clemson is required to fly the state flag, for example, and to teach a course in state traffic law, indicate nothing more than that Clemson is a state-assisted school --- a fact which nobody denies.[13]    Cf. Samuel v. University of Pittsburgh, 375 F.Supp.

---

[10]    Pullman, Inc. v. Volpe, 337 F.Supp. 432 (E.D.Pa. 1971).

[11]    Litton RCS, Inc. v. Pennsylvania Turnpike Comm'n, 376 F.Supp. 579 (E.D.Pa. 1974), aff'd without opinion, 511 F.2d 1394 (3d Cir. 1975).

[12]    Southern Bridge Co. v. Dep't of Highways, 319 F.Supp. 948 (E.D.La. 1970). Numerous additional examples are cited in 6 A.L.R. Fed. 615 (1987).

[13]    Cf. Gordenstein v. University of Delaware, 381 F.Supp. 718, 711 (D.Del. 1974) (cited in Pfs. Opp. Mem. at 8) (that the University of Delaware was required by state law to give a course

9

1119 (W.D. Pa. 1974), reversed on other grounds, 538 F.2d 991 (3d Cir. 1976) (cited in Kaiser Gypsum's Mem. at 8) (University of Pittsburgh and Temple are "state-related universities" and although Penn State falls "somewhere between state colleges and state related schools"; all three are independent entities for purposes of 11th Amendment).

Thus, references to Clemson University as "the state" or a "state agency" in various state opinions, briefs, and Attorney General opinion letters, do not control the diversity inquiry. In such discussions, these terms are often loosely used as a catch-all to describe all public bodies without distinguishing between state-level and municipal-level bodies. It is not necessary to distinguish between them for state immunity purposes, whereas for federal diversity purposes the exact categorization is critical.

The U.S. Supreme Court in Hopkins v. Clemson, 221 U.S. 636, 31 S.Ct. 654 (1911) made it clear that Clemson University is separate and distinct from the state. It was ". . . an entity, a corporation, a juristic person . . . with the provision that it might sue and be sued . . . ." 31 S.Ct. at 658. As plaintiffs show next, in addition to the various elements of independence

---

on Delaware history, to be taken by all students, did not make it an "alter ego" of the state for 11th Amendment purposes, nor did the facts that (1) it was required to submit an annual report to the Governor and the legislature; (2) the state did an annual audit of the school's finances; (3) the state controlled the use of some of its scholarship money; (4) it was required to maintain a school of agriculture, a summer school for teachers, and a physical education department.

cited in their earlier memorandum, Clemson's financial practices further support a finding that it is sufficiently separate from the state to be a citizen.

> B.  Clemson's Finances Show Considerable Independence From the State of South Carolina

During argument, the Court expressed interest in the level of state involvement in Clemson's financial activity. Tr. 83-4. Plaintiffs have shown in their previous memorandum that Clemson receives more than 50% of its operating funds from non-state sources. Pfs. Opp. Mem. at 12. Clemson University's unique and separate status from the state can further be seen by examination of its bonding practices.[14] In order to finance large scale projects, Clemson University can: (1) issue bonds in its own name, secured by its own property and the income generated by it; or (2) it can involve the state in financing through bonds, which are ultimately backed by the state.

The first type of bonds, issued under authority of § 59-119-310, are secured by Clemson's own non-tuition revenue. For the year ended June 30, 1987, 80.8% of Clemson's outstanding

---

[14]  While finances are important, clearly the most important factor showing independence from the state is the makeup of Clemson's Board of Trustees which is itself a body politic and corporate and consists of a majority of privately appointed Trustees.  See discussion in Pfs.Opp.Mem. at 10-12.  By way of contrast, the Board of Trustees at the University of South Carolina consists of 4 ex officio members (the Governor, the State Superintendent of Education, and the chairman of the committee on education of both the state House of Representatives and the state Senate), and fourteen members to be elected by the General Assembly.  S. C. Code § 59-117-10.

11

indebtedness consisted of these internally secured bonds.[15] These bonds are payable solely from revenues generated by Clemson, and are not obligations of the state.[16] Revenues securing the non-state obligations come from either the student University Fee, paid by students (which is in addition to the tuition for each semester), or from income generated by the project for which the financing is used.[17] After the obligations on Clemson's non-state bonds are provided for, the balance of the University Fee goes to an operating fund out of which operating expenses are paid. The Commission on Higher Education does not have the authority to direct the use of Clemson's University Fee, nor does it have the authority to require that the fee be increased or decreased.[18] Any funding for asbestos removal, if Clemson did not prevail in this lawsuit, would likely come from the residual operating fund, which, if inadequate to cover the expense, could be supplemented by an increase in the University Student Fee to cover new Clemson-backed bonds.

As noted, Clemson can also utilize state institution bonds. As of June 30, 1987, only 19.2% of Clemson's outstanding bond indebtedness consisted of obligations on state institution

---

[15] See Clemson University 1986-87 Financial Report at 20. [Exhibit B]

[16] See § 59-119-590; Prospectus for Clemson University Student and Faculty Housing Refunding Revenue Bonds at 4. [Exhibit E].

[17] See Prospectus for Clemson University Student and Faculty Housing Refunding Revenue Bonds at 14-15. [Exhibit F].

[18] See 1978 Att'y Gen. Op. No. 78-16 p. 28. [Exhibit H].

bonds.[19]   State institution bonds are authorized by § 59-107-110 et seq. and are issued by the State of South Carolina.  The bonds are ultimately backed by the full faith and credit of the state, but are primarily secured by Clemson's pledge of all its tuition funds for the life of the bond.[20]  There are special provisions to ensure that Clemson, not the state, actually retires these bonds.  Under Article X, § 5(b) of the state Constitution, the state may not issue such bonds unless Clemson's maximum annual debt service on all of its outstanding state institution bonds is less than 90% of the tuition fees received in the preceding year.[21]  The pledged tuition fee is collected in a fund and applied toward the outstanding state institution bonds for Clemson.[22]  Thus, no funds are actually paid out of the state treasury for the retirement of Clemson's indebtedness on the

---

[19]   See Clemson University 1986-87 Financial Report at 20, attached as Exhibit B.

[20]   See Prospectus for Clemson University Student and Faculty Housing Refunding Revenue Bonds at 14.  [Exhibit C attached hereto.]

[21]   See Official Statement Relating to the Issuance of $85,000,000 State Capital Improvement Bonds, Series S, of the State of South Carolina, May 1, 1987, at 6 and at 7 (setting forth relevant constitutional provision and explanation of its operation).  [Exhibit D attached hereto].  See also Arthur v. Byrnes, 224 S.C. 51, 77 S.E.2d 311 (1953) (South Carolina could not issue bonds for improvements at Clemson where tuition fees annualized over the life of the bonds would provide an inadequate margin of coverage) (construing predecessor provision of constitution).

[22]   Clemson meets its primary obligation to retire the state institution bonds by the annual assessment of a tuition and matriculation fee on all Clemson students, with residents paying $30.00 and non-residents $105.00 per semester to retire these bonds.  [See Exhibit G].

13

state institution bonds.  All of Clemson's "state backed" obligations are paid out of tuition fees.  The state's obligation on such bonds is not only indirect, but quite remote.  In fact, Clemson has never defaulted on any bond issued by or on behalf of it.[23]

In conclusion, less than 20% of Clemson's bond obligations are backed by the state of South Carolina.  Even those obligations are secured primarily by Clemson's pledge of tuition fees and only secondarily by the full faith and credit of the state.  Moreover, a separate fund for payment on the bonds is required by the State Constitution, and thus the State Treasurer lacks authority to use any Clemson tuition funds for any purpose other than retirement of Clemson's institution bond debt.[24]  As with Clemson's non-tuition revenues, its tuition funds are not comingled with other state funds, and are not available to the state to supplement its general state revenues.  Clemson's independence from the state in financial matters is significant indeed.

IV

ANY DEFECTS IN THE NAMED CLASS
REPRESENTATIVES DO NOT WARRANT DISMISSAL

At argument the Court also inquired about the proper course if Clemson and the College of Charleston were both  found not to be citizens.  Tr. 82.  Unlike an individual action, any

---

[23]    See Prospectus for Clemson University Student and Faculty Housing Refunding Revenue Bonds at 17-18.  [Exhibit I].

[24]    [Exhibit D]; South Carolina Constitution, Apt. X, Sect. 5(b).

14

jurisdictional defect in the named class representative can be remedied by substitution of a diverse plaintiff from within the class of colleges and universities. One such readily available plaintiff is Central Wesleyan College. Indeed, this is the precise remedy employed in a famous class action where the citizenship of the named plaintiffs was judged not diverse from defendants.

In In re Federal Skywalk Cases, 93 F.R.D. 415 (W.D.Mo. 1982), vacated on other grounds, 680 F.2d 1175 (8th Cir. 1982), cert. denied 459 U.S. 988, 103 S.Ct. 342 (1982), Judge Wright was faced with a situation identical to that which would arise here should the court find that neither Clemson nor the College of Charleston are diverse. After the class action in Federal Skywalk had been filed but before it was certified, the court found that the plaintiff who sought to serve as named representative was not diverse from all of the defendants. Instead of dismissing the case, the court substituted other class members whose citizenships were diverse from all the defendants and allowed them to proceed as class representatives, thus resolving any problem of federal jurisdiction.

On appeal the Eighth Circuit vacated Judge Wright's order certifying a mandatory class on Anti-Injunction grounds. In doing so it approved in substance the district court's efforts to substitute a diverse named plaintiff once it became clear that

15

the original named plaintiff was not diverse.[25]  Although it questioned Judge Wright's procedure for doing so (which included ex parte communications with counsel for the substitute plaintiff that he had selected), the court strongly suggested that it approved of the result -- i.e. the substitution of a diverse plaintiff for the non-diverse original named plaintiff:

> Once it became apparent that the named plaintiff could not serve as class representative, we think the better practice would have been for the district judge to have called counsel of all potential class representatives and held a hearing to determine whether any of them would serve as class representative in the event the district judge decided to certify a class.

In re Federal Skywalk Cases, 680 F.2d 1175, 1184 (8th Cir. 1982). The court went on to indicate that aside from the Anti-Injunction problems with the mandatory class, it approved of Judge Wright's handling of the case.

> We conclude that Judge Wright certified the class based solely on his judgment that such action would best serve the interests of all parties involved.  In addition, we note the complexity of the issues before Judge Wright and commend his creative efforts in attempting to achieve a fair, efficient and economical trial for the victims of the Hyatt Regency disaster.

Id.  In his dissent from the Anti-Injunction holding, Judge Heaney supported the district court's resolution of the class certification issue.  In doing so he rejected the defendants'

---

    25   On remand the trial court retained diversity jurisdiction and certified a voluntary class.  In re Federal Skywalk Cases, 95 F.R.D. 483 (W.D. Mo. 1982).  The action was ultimately settled.

contention that because the party who had moved for class certification was not diverse, the class could not properly be certified. A court, Judge Heaney reasoned, may elect to certify a class sua sponte and may select a class representative even if no party seeks a class action. Id. at 1188 (citing Ford v. U.S. Steel Corp., 638 F.2d 753 (5th Cir. 1981). Thus, the district court's jurisdiction cannot be dependent on whatever party may choose to come forward as the initial class representative. Id. at n. 11.

The Supreme Court has approved substitution of named representatives analogous to that sought here. In United States Parole Comm'n v. Geraghty, 445 U.S. 388, 100 S.Ct. 1202 (1980), the Court held that the named plaintiff, a prisoner challenging parole release guidelines, could challenge the district court's denial of class certification on appeal, even though his claim on the merits had been mooted by his release from prison. The Court remanded the case, instructing the district court to determine whether another named plaintiff should be substituted to represent the class.

The Courts of Appeals have construed Geraghty as permitting a "rotating" named representative in class actions where the claim of the original plaintiff becomes moot and he can not serve, see e.g. Graves v. Walton County Board of Education, 686 F.2d 1135 (11th Cir. 1982).

Likewise, the doctrine has been applied to allow "substitute" named plaintiffs where the original named plaintiff

17

did not have standing to sue.  In a series of cases, the Fourth Circuit has adopted an exceedingly liberal attitude toward the continuation of class actions where the named plaintiff is held for one reason or another to be unqualified to represent the class.  In Goodman v. Schlesinger, 584 F.2d 1325 (4th Cir. 1978), for example, the court affirmed the dismissal on the merits of the named plaintiff's Title VII claim.  It held, however, that it was not proper for the district court to dismiss the class action because the named plaintiff no longer had a claim.  Although the court held that "[t]he named plaintiffs may not represent the class on remand" it treated the class claims as separate and independent from those of the named representative.  Accordingly, it instructed the district court to retain the class action on the docket "for a reasonable time to permit a proper plaintiff or plaintiffs, with grievances similar to those of [the named plaintiffs] in person, to present himself to prosecute the action as class representative." Id. at 1332-33.  The court held that "[i]f such a plaintiff so comes forward, the court should then . . . decide whether a class action is maintainable and whether the then named plaintiff should represent the class." Id.

Thus, even when the class has not yet been certified, the Fourth Circuit rule requires the district court to hold the action as filed, pending the appearance of a proper plaintiff and a subsequent determination of the appropriateness of class treatment under Rule 23.  This rule has been consistently adhered to by the Fourth Circuit both before and after the Supreme

18

Court's decision in East Texas Motor Freight System, Inc. v. Rodriquez, 431 U.S. 395, 97 S.Ct. 1891 (1977).[26]  The only limitation on the rule appears to be that the substitute plaintiff or plaintiffs must be members of the putative class--- as would be the case here.

In this case, of course, the court would not have to "hold" the case on the docket without a representative since there is already a class member, Central Wesleyan, who is ready to serve as the named plaintiff and is doing so in a companion case.  Thus the court could (as the court did in Federal Skywalk Cases) simply substitute Central Wesleyan as the named plaintiff and let the action continue.

V
## CONCLUSION

Kaiser Gypsum's motion to dismiss should be denied for two independent reasons.  Clemson University is (1) a municipal corporation and (2) is not the alter ego of the state for diversity purposes.  Either finding in Clemson's favor is dispositive of the citizenship issue.  Thus, Clemson University is a proper class plaintiff for the purposes of maintaining this action.  Moreover, in the event this court were to be of a contrary opinion and believe that both Clemson University and the College of Charleston are alter egos of the state, such lack of

---

[26]    See Cox v. Babcock & Wilcox Co., 471 F.2d 13 (4th Cir. 1972); Harris v. Ballone, 681 F.2d 225 (4th Cir. 1982); International Woodworkers of America v. Chesapeake Bay Plywood Corp., 659 F.2d 1259 (4th Cir. 1981).

19

diversity is not fatal, and this action may continue with substitution of a proper plaintiff from within the class.

Respectfully submitted,

Motley, Loadholt, Richardson,
& Poole

Edward J. Westbrook
J. Anderson Berly, III
151 Meeting Street
P. O. Box 1137
Charleston, SC  29401

Daniel A. Speights
P. O. Box 685
Hampton, SC  29924

Cameron McGowan Currie
P. O. Box 7667
Columbia, SC  29202

Herbert B. Newberg, Esq.
Lippincott Building, Suite 200
227 S. 6th. Street
Philadelphia, PA  19106

Professor Arthur Miller
Harvard Law School
Langdell West 227
Cambridge, MA  02138

By: _____

Attorneys for Plaintiffs
Dated: 3/16/88
Charleston, South Carolina

20

CERTIFICATE OF SERVICE

This is to certify that I have this day served counsel for all parties in the foregoing matter with a copy of the Class Plaintiffs' Memorandum of Points and Authorities Supplementing Oral Argument in Opposition to Kaiser Gypsum's Motion to Dismiss, by addressing same to:

Cameron M. Currie, Esq.
P.O. Box 7667
Columbia, SC  29202

Daniel A. Speights, Esq.
304 Lee Avenue
P.O. Box 685
Hampton, SC  29924

R. Bruce Shaw, Esq.
Nelson, Mullins, Riley,
  & Scarborough
P.O. Box 11070
Columbia, SC  29211

P. Michael Duffy, Esq.
Morris, Duffy & Boone
141 East Bay Street

Joseph A. Rhodes, Jr., Esq.
Haynsworth, Baldwin, Miles,
  Johnson, Greaves & Edwards
P.O. Box 10888
Greenville, SC  29603

by placing same in the United States Mail with sufficient postage affixed to assure delivery.

This _10_ day of _Mar._ , 1988.

J. Anderson Berly, III, Esq.
MOTLEY, LOADHOLT, RICHARDSON
  & POOLE
151 Meeting Street
P.O. Box 1137
Charleston, SC  29402
(803) 577-6747

Attorneys for Plaintiffs

80303-6

21

# The State of South Carolina.

## BY THE SECRETARY OF STATE.

**Whereas,** _____ qualified voters of the proposed town of __CLEMSON__ _____ day of __November__ _____ 19__ , filed with the Secretary of State a written petition, signed by themselves, setting forth:

**FIRST:** The names and residence of the said petitioners to be in the proposed town of __CLEMSON;__

**SECOND:** The corporate limits of the proposed town to be, as set forth upon a map on file in Secretary of State's office:

**THIRD:** The number of inhabitants to be over one thousand and less than five thousand.

**FOURTH:** That they desire to be incorporated under the provisions of Sections 7445-7452 of the Code of South Carolina, 1942;

**NOW, THEREFORE, I,** __W. P. Blackwell__ _____ , Secretary of State, by virtue of the authority in me vested by an Act of the General Assembly, entitled "An Act to Provide for the Incorporation of Towns of Not Less Than One Thousand, Nor More Than Five Thousand, Inhabitants," approved the fifth day of March, A. D. 1896, and all Acts amendatory thereto, do hereby Commission __L. P. Crawford,__ __E. O. Godber, Bratton Williams, Joe Lindsay, Frank Dillard__ and present Mayor and Council of __Clemson__ to procure the proper registration of all electors of the town within the proposed corporate limits, to advertise the election for twenty days, and to appoint managers to conduct the same, which election shall be conducted as other municipal elections, and at such election the electors shall vote on the following questions: 1st, Corporation; 2d, Name; 3d, A Mayor and six Aldermen. And that you make a return to the Secretary of State, attaching said manner; to make to you a sworn return of the result; and that you make a return to the Secretary of State, attaching said manner-dered return.

**GIVEN** under my Hand and Seal of the State, this the __first__ _____ day of __November__ _____ in the year of our Lord one thousand nine hundred and __nineteen__ 40, _____ and in the one hundred and __seventy first__ _____ year of the Independence of the United States of America.

_W. P. Blackwell_

# CLEMSON
# UNIVERSITY



F I N A N C I A L
R E P O R T



1986 - 1987

## (5) Leases

During 1987, the University installed certain data processing and office equipment under a capital lease that expires in December, 1991. At June 30, 1987, the gross amount of this lease was $3,630,607 and is included in Investment in Plant as equipment. The present value of future minimum capital lease payments as of June 30, 1987 is:

Year ending June 30:

| | |
|---|---:|
| 1988 | $ 565,373 |
| 1989 | 565,373 |
| 1990 | 565,373 |
| 1991 | 565,373 |
| 1992 | 567,863 |
| Total minimum lease payments | $2,829,355 |
| Less amount representing interest at 6.8% | 498,748 |
| Obligation under capital lease | $2,330,607 |

The University leases certain farm vehicles and data processing and office equipment under various lease agreements, which, according to University policy, are all classified as operating leases. No agreements are classified as capital leases due to the immaterial effect that such leases would have on the University's general purpose financial statements. The terms of the leases generally range from one to four years; however, all agreements are cancellable if the State of South Carolina does not provide adequate funding. Total rental expense for these leases amounted to $1,674,545 in 1987 and $1,781,720 in 1986. The University has not entered into any material lease agreements since June 30, 1987, and consequently anticipates that future rental expense will approximate the 1987 amount.

## (6) Bonds Payable

Bonds payable consists of the following:

| | INTEREST | MATURITY | 1987 | 1986 |
|---|---|---|---:|---:|
| **State Institution Bonds** | | | | |
| Bonds dated 9/1/77 | 4-4.75% | 12/1/91 | $ 1,250,000 | $ 1,500,000 |
| Bonds dated 3/20/79 | 5.1-6.0% | 12/1/95 | 5,600,000 | 6,000,000 |
| | | | $ 6,850,000 | $ 7,500,000 |
| **Student and Faculty Housing Revenue Bonds** | | | | |
| Series H dated 7/1/78 | 5.45% | 7/1/98 | $ 4,235,000 | $ 4,620,000 |
| Series I dated 12/1/82 | 6.25-10.4% | 7/1/03 | 2,810,000 | 2,890,000 |
| Series J dated 12/1/82 | 6.25-10.4% | 7/1/03 | 8,965,000 | 9,340,000 |
| | | | $16,010,000 | $16,850,000 |
| **Stadium Refunding Bonds** | | | | |
| Bonds dated 5/1/85 | 5.25-8.8% | 5/1/00 | $ 9,310,000 | $ 9,740,000 |
| **Plant Improvement Bonds** | | | | |
| Bonds dated 12/1/78 | 5.25-6.75% | 3/1/99 | $ 1,600,000 | $ 1,710,000 |
| Bonds dated 4/1/84 | 9-10% | 3/1/04 | 2,300,000 | 2,400,000 |
| | | | $ 3,900,000 | $ 4,110,000 |
| Total | | | $36,070,000 | $38,200,000 |
| Less amounts included in unexpended and renewals and replacements plant funds | | | 447,425 | 1,547,250 |
| Bonds payable in investment in plant | | | $35,622,575 | $36,652,750 |

Tuition and matriculation fees paid to the University are restricted for the payment of principal and interest on State Institution Bonds.

Student and Faculty Housing Revenue Bonds are secured by a pledge of the revenues received from dormitory and student/faculty housing.

Stadium Refunding Bonds are secured by a pledge of the excess of Athletic Department revenues over expenditures.

Plant Improvement Bonds are secured by a pledge of a special student fee designated for the improvement of plant.

*In the opinion of Bond Counsel, interest on the Bonds of Series I and Series J is exempt from federal income taxation under existing statutes, regulations, rulings, and court decisions and the Bonds of Series I and Series J and the interest thereon are exempt from taxation under the laws of South Carolina except as to inheritance, estate or transfer taxes. See "Tax Exemption" herein.*

NEW ISSUES

# CLEMSON UNIVERSITY, SOUTH CAROLINA

## $3,100,000

## STUDENT AND FACULTY HOUSING REFUNDING REVENUE BONDS, SERIES I

*AND*

## $10,240,000

## STUDENT AND FACULTY HOUSING REVENUE BONDS, SERIES J

The Bonds of Series I and Series J will be dated December 1, 1982. Principal and interest (January 1 and July 1; first coupon July 1, 1983) are payable in the amounts and at the annual rates shown below, at the principal office of Manufacturers Hanover Trust Company in the City of New York, State of New York. The Bonds of Series I and Series J are issuable as coupon bonds in the denomination of $5,000 and are registrable as to principal only as provided in the Bond Resolution of the Board of Trustees of Clemson University which authorized the issuance of the Bonds of Series I and Series J.

The Bonds of Series I and Series J are subject to redemption prior to maturity as described herein.

The Bonds of Series I are being issued to refund three (3) series of outstanding Student and Faculty Housing Revenue Bonds of Clemson University, as more fully described herein. The Bonds of Series J are being issued to provide funds with which to pay the principal of the $5,300,000 Bond Anticipation Notes of Clemson University, maturing April 1, 1983 and to defray the cost of constructing additional Student and Faculty Housing Facilities for Clemson University, South Carolina.

The Bonds of Series I and Series J do not constitute an indebtedness of the State of South Carolina within the meaning of any provision, limitation or restriction of the Constitution or Laws of the State of South Carolina. The Bonds of Series I and Series J are payable solely from the revenues derived by Clemson University from the Student and Faculty Housing Facilities, as such are defined in the Bond Resolution.

### $3,100,000 Series I

| Due July 1 | Amount | Rate | Price | Due July 1 | Amount | Rate | Price |
|---|---|---|---|---|---|---|---|
| 1984 | $ 65,000 | 6.25% | 100% | 1990 | $100,000 | 8.25% | 100% |
| 1985 | 70,000 | 6.75 | 100 | 1991 | 105,000 | 8.60 | 100 |
| 1986 | 75,000 | 7.25 | 100 | 1992 | 115,000 | 8.90 | 100 |
| 1987 | 80,000 | 7.50 | 100 | 1993 | 125,000 | 9.25 | 100 |
| 1988 | 85,000 | 7.75 | 100 | 1994 | 135,000 | 9.50 | 100 |
| 1989 | 90,000 | 8.00 | 100 | 1995 | 150,000 | 9.75 | 100 |

$1,905,000 10.4% Term Bonds Due July 1, 2003—Price—100%
(Accrued interest to be added from December 1, 1982)

### $10,240,000 Series J

| Due July 1 | Amount | Rate | Price | Due July 1 | Amount | Rate | Price |
|---|---|---|---|---|---|---|---|
| 1984 | $250,000 | 6.25% | 100% | 1990 | $500,000 | 8.25% | 100% |
| 1985 | 300,000 | 6.75 | 100 | 1991 | 550,000 | 8.60 | 100 |
| 1986 | 350,000 | 7.25 | 100 | 1992 | 600,000 | 8.90 | 100 |
| 1987 | 375,000 | 7.50 | 100 | 1993 | 650,000 | 9.25 | 100 |
| 1988 | 400,000 | 7.75 | 100 | 1994 | 675,000 | 9.50 | 100 |
| 1989 | 450,000 | 8.00 | 100 | 1995 | 700,000 | 9.75 | 100 |

$4,440,000 10.4% Term Bonds Due July 1, 2003—Price—100%
(Accrued interest to be added from December 1, 1982)

*The Bonds of Series I and Series J are offered when, as and if issued and received by the Underwriters, subject to the unqualified approval of legality by Sinkler Gibbs & Simons, Columbia, South Carolina, Bond Counsel. It is expected that the Bonds of Series I and Series J, in definitive form, will be available for delivery in New York, New York, on or about December 23, 1982.*

**Bankers Trust of South Carolina**

**The Citizens and Southern National Bank of South Carolina**

**First National Bank of South Carolina**

**The South Carolina National Bank**

December 17, 1982

(b) *Refunded Bonds* shall mean the outstanding Bonds of Series C, Series F and Series G, which as of December 1, 1982, are in the aggregate principal amount of $4,870,000;

(c) *Regulations* shall mean the regulations adopted by the Treasury Department of the United States of America pursuant to Section 103(c) of the Internal Revenue Code of 1954, as amended; and

(d) *SLGS* shall mean direct obligations of the United States of America issued in book entry form, none of which are subject to redemption, prior to maturity at the option of the obligor;

Pursuant to the provisions of Section 4.06 of the Supplemental Resolution, a portion of the proceeds of the Bonds of Series I are to be delivered to the Escrow Holder under the Escrow Deposit Agreement and disposed of by the Escrow Holder for the acquisition of SLGS in order to provide for the defeasance of the Refunded Bonds. The Escrow Deposit Agreement will become effective between Clemson and the Escrow Holder on the date of the issuance and delivery of the Bonds of Series I. Under the Escrow Deposit Agreement, provision for the payment in full of the Refunded Bonds will be made through the establishment of an Escrow Deposit Fund from which payment of all Refunded Bonds and the interest due thereon will be made as the same become due and payable.

In addition to a portion of the proceeds of the Bonds of Series I, Clemson will deposit with the Escrow Holder in such Escrow Deposit Fund, additional moneys with which to purchase obligations of the United States or agencies thereof, the principal of and the interest on which when due and payable and received by the Escrow Holder, together with the sums realized from the SLGS purchased with a portion of the proceeds of the Bonds of Series I, will provide moneys sufficient to pay the principal of and interest to become due on the Refunded Bonds. Upon the execution and delivery of the Escrow Deposit Agreement, and the simultaneous funding of the Escrow Deposit Fund, the Refunded Bonds shall be deemed paid and consequently, the rights granted to the holders of the Refunded Bonds will have ceased, determined and become void, except for the right to the payment of the Refunded Bonds and the interest thereon and certain other rights with respect to the registration of the Refunded Bonds and the replacement thereof upon loss, destruction or mutilation thereof.

## DEBT OF CLEMSON UNIVERSITY

### Outstanding Debt Held by Public

State Institution Bonds have been issued on behalf of Clemson, which, outstanding as of November 1, 1982, amounted to $9,350,000. State Institution Bonds are general obligations of the State of South Carolina and are issued pursuant to Chapter 107, Title 59, Code of Laws of South Carolina, 1976, as amended (the State Institution Bond Act). Bonds may be issued pursuant to the State Institution Bond Act for the benefit of certain State supported institutions of higher learning for the purpose of obtaining permanent improvements for such institutions, and to defray the cost of acquiring or improving land for such improvements. They are secured by a pledge of the full faith, credit and taxing power of the State of South Carolina and, in addition, by a pledge of the tuition and matriculation fees collected by the institution.

Act No. 1009 of the Acts and Joint Resolutions of the General Assembly of South Carolina for the year 1962, as amended, authorized Clemson to issue bonds for the purpose of providing funds to defray a portion of the cost of constructing and equipping a new library on the Clemson campus. Pursuant to said Act, Clemson issued $1,500,000 Library Bonds of Clemson University in 1965. The bonds are payable solely from the revenues derived from a Special Student Fee imposed by Clemson upon all students now or hereafter in attendance at any regular semester or summer school session

14

*Assuming continued compliance with certain covenants, interest is excludable, in the opinion of Bond Counsel, from gross income for federal income tax purposes under existing statutes and regulations. The Bonds and the interest thereon will be exempt from all State, county, municipal and school district and other taxes or assessments imposed within the State of South Carolina, except inheritance, estate or transfer taxes. See "Tax Exemption" herein for a description of certain other taxes imposed on certain corporations as well as minimum taxation treatment.*

Dated: May 1, 1987

Ratings: Moody's Investors Service, Inc. — Applied for
Standard & Poor's Corporation — Applied for

# OFFICIAL STATEMENT

## Relating to the Issuance of
# $85,000,000 STATE CAPITAL IMPROVEMENT BONDS, SERIES S, OF THE STATE OF SOUTH CAROLINA
*Secured by a pledge of the full faith, credit and taxing power of the State of South Carolina*



The Bonds are being issued to defray the cost of construction of capital improvements of the State of South Carolina.

## THIS OFFICIAL STATEMENT

Prepared under the supervision of
### GRADY L. PATTERSON, JR.
*State Treasurer*
of the
· State of South Carolina

### AMOUNTS, MATURITY DATES

| Amount | Due August 1 | Amount | Due August 1 |
|---|---|---|---|
| $2,000,000 | 1988 | $6,000,000 | 1996 |
| 3,000,000 | 1989 | 6,000,000 | 1997 |
| 4,000,000 | 1990 | 6,000,000 | 1998 |
| 4,000,000 | 1991 | 6,000,000 | 1999 |
| 5,000,000 | 1992 | 6,000,000 | 2000 |
| 5,000,000 | 1993 | 7,000,000 | 2001 |
| 5,000,000 | 1994 | 7,000,000 | 2002 |
| 6,000,000 | 1995 | 7,000,000 | 2003 |

SEALED BIDS will be received until 11 o'clock, A.M. (Local Time)

May 5, 1987

In the Office of the State Treasurer, Columbia, South Carolina

The Bonds are offered when, as and if issued and received by the successful bidder and are subject to the approval of legality by Sinkler & Boyd, Bond Counsel. It is expected that the Bonds in definitive form will be available for delivery in New York, New York on or about May 21, 1987.

Dated: April 24, 1987

collection of such taxes by the appropriate State officers. The Court held that the provisions of the Constitution and statutes constitute complete authorization for the issuance of the debt and that no further action by the State itself is necessary in connection therewith; that the required levy, collection and application of the necessary taxes to retire the debt are merely "ministerial acts" of the officers or agents of the State charged with such responsibility. Therefore, while the State has not consented to judicial enforcement against the State itself, a holder of the debt could enforce payment by way of mandamus against the officers and agents of the State requiring that they perform the duties imposed by the Constitution and statutes and take the required action so that sufficient taxes would be levied and collected for payment of the debt.

In the opinion of the Attorney General and Bond Counsel, a holder of general obligation debt of South Carolina would be able to enforce its payment by a mandamus proceeding against the appropriate officers and agents of the State.

# DEBT OF THE STATE OF SOUTH CAROLINA

## Article X of the South Carolina Constitution

Article X of the South Carolina Constitution was unanimously proposed by the 1976 General Assembly. It was voted upon favorably in the general election held on November 2, 1976, and was subsequently ratified by the General Assembly to become effective after November 30, 1977.

The following is a summary of the provisions of Article X as they relate to the general obligation debt of the State:

1. "General Obligation Debt" shall mean any indebtedness of the State which shall be secured in whole or in part by a pledge of the full faith, credit and taxing power of the State.

2. General obligation debt may not be incurred except for a public purpose, and all general obligation debt shall mature not later than thirty years from the time such indebtedness shall be incurred.

3. In each act authorizing the incurring of general obligation debt the General Assembly shall allocate on an annual basis sufficient tax revenues to provide for the punctual payment of the principal of and interest on such general obligation debt.

4. If at any time any payment due as the principal of or interest on any general obligation debt shall not be paid as and when the same becomes due and payable, the State Comptroller General shall forthwith levy and the State Treasurer shall collect an ad valorem tax without limit as to rate or amount upon all taxable property in the State sufficient to meet the payment of the principal of and interest on such general obligation debt then due.

5. Unless general obligation debt be authorized by (a) two-thirds of the members of each House of the General Assembly, or (b) a majority vote of the qualified electors of the State voting in a referendum called by the General Assembly, the following restrictions apply:

(a) General obligation debt may be incurred for highway purposes (Highway Bonds) if such bonds shall be additionally secured by so much of the revenues as may be made applicable by the General Assembly for State highway purposes from any and all taxes or licenses imposed upon individuals or vehicles for the privilege of using the public highways of the State; provided, that the maximum annual debt service on all Highway Bonds so additionally secured which shall be outstanding shall not exceed fifteen percent of the proceeds received from such sources of revenue for the fiscal year next preceding.

(b) General obligation debt may be incurred for any State institution of higher learning designated by the General Assembly (State Institution Bonds), if such bonds shall be additionally secured by a pledge of the revenues derived from the tuition fees received by the particular institution of higher learning for which such State Institution Bonds are issued; provided, that the maximum annual debt service on issues of State Institution Bonds so additionally secured issued for such State institution to be outstanding shall not exceed ninety percent of the sums received by such State institution of higher learning from tuition fees for the fiscal year next preceding.

(c) General obligation debt may be incurred for any public purpose including those purposes set forth in (a) and (b); provided, that the maximum annual debt service on all general obligation bonds of the State henceforth to be outstanding (excluding Highway Bonds, State Institution Bonds, tax anticipation notes and bond anticipation notes) shall not exceed five percent of the general revenues of the State for the fiscal year next preceding (excluding revenues which are authorized to be pledged for State Highway Bonds and State Institution Bonds).

The constitutional restrictions on general obligation debt do not preclude more stringent statutory limitations.

## General Obligation Debt Now Outstanding

General obligation debt of the State now outstanding which was incurred prior to November 30, 1977, was issued pursuant to the "special fund doctrine" first enunciated by the South Carolina Supreme Court in the case of *State ex rel.*

6

*Richards v. Moorer*, 152 SC 4⬤150 SE 269 (1929) which upheld the statute a⬤orizing the issuance of general obligation State Highway Bonds.

The "special fund doctrine" permitted the State to pledge its full faith and credit for the payment of bonds if there had been created, and irrevocably pledged to the payment of such bonds, a special fund which had been ascertained to be sufficient for the payment of the principal of and interest on the debt so incurred. The decisions upholding a pledge of the full faith and credit of the State when a "special fund" had been created and pledged, overrode a constitutional provision which required all general obligation debt of the State to be voted upon favorably by a two-thirds majority of those voting in a general election.

There are four categories of State general obligation debt now outstanding which were issued pursuant to statutes which established special funds for their payment. These are:

1. State School Bonds: As of May 2, 1987, $12,000,000 of State School Bonds will be outstanding. State School Bonds issued prior to the effective date of new Article X were secured by a pledge of the revenues derived from the retail sales tax. State School Bonds issued after November 30, 1977, are not secured by the special fund. Of the principal amount of State School Bonds outstanding as of May 2, 1987, none were issued prior to November 30, 1977.

2. State Capital Improvement Bonds: Act 1377 set up as the special fund for the security of such bonds that portion of the State income tax not previously pledged for then outstanding State Ports Bonds. Including the State Capital Improvement Bonds now offered, $642,935,000 of State Capital Improvement Bonds will be outstanding following the issuance of the proposed Bonds. State Capital Improvement Bonds issued after November 30, 1977, are not secured by the special fund established by Act 1377. Of the principal amount of State Capital Improvement Bonds outstanding as of May 2, 1987, $63,000,000 were issued prior to November 30, 1977 and therefore are additionally secured as described above.

3. State Highway Bonds: As of May 2, 1987, State Highway Bonds in the principal amount of $16,500,000 will be outstanding which are secured by the special fund created from revenues derived from 9.34 cents per gallon of the 13-cent per gallon gasoline tax, the fuel oil tax, the road tax and the motor vehicle license tax imposed by the State of South Carolina. Traditionally, State Highway Bonds have been paid from such sources of revenue. By reference to paragraph 5 (a) under the heading "Article X of the South Carolina Constitution" herein, the practice of permitting State Highway Bonds to be additionally secured by revenues made applicable by the General Assembly for State highway purposes will continue. The difference is that the justification for the issuance of State Highway Bonds results from the specific constitutional authorization rather than from the special fund doctrine. Henceforth, State Highway Bonds which will be general obligation debt of the State of South Carolina, will be additionally secured by a pledge of so much of the revenues made applicable by the General Assembly for State highway purposes from any and all taxes or license fees imposed upon individuals or vehicles for the privilege of using the public highways of the State. Paragraph 6 (a) of Section 13 of Article X provides that the maximum annual debt service on all State Highway Bonds so additionally secured shall not exceed 15% of the proceeds from the above described sources for the fiscal year next preceding. The debt limit now applicable to State Highway Bonds is the lesser of the present dollar limitation of $157,000,000 or that which results from the application of the limitation imposed by the constitutional provision relating to State Highway Bonds.

4. State Institution Bonds: State Institution Bonds in the principal amount of $18,590,000 will be outstanding as of May 2, 1987. State Institution Bonds are secured by the respective special funds created at each State Institution from the tuition fees imposed at such institution. Traditionally, State Institution Bonds have been paid from such sources of revenue. By reference to paragraph 5 (b), under the heading "Article X of the South Carolina Constitution" herein, the practice of permitting State Institution Bonds to be additionally secured by revenues derived from tuition fees is continued. The difference is that the justification for the issuance of State Institution Bonds results from the specific constitutional authorization rather than from the special fund doctrine. State Institution Bonds constitute general obligation debt of the State of South Carolina, additionally secured by a pledge of the revenues derived from tuition fees at the State Institution for which bonds are issued. Paragraph 6 (b) of Section 13 of Article X provides that the maximum annual debt service on all State Institution Bonds so additionally secured shall not exceed 90% of the sum received by the particular institution for the fiscal year next preceding. The debt limit now applicable to State Institution Bonds is the lesser of the present dollar limitation of $60,000,000 or that which results from the application of the limitation imposed by the constitutional provision relating to State Institution Bonds. As of May 2, 1987, State Institution Bond Anticipation Notes in the principal amount of $8,240,000 will be outstanding.

## Revenue Bonds and Notes

In addition to the general obligation debt above described, there are presently outstanding various types of revenue bonds for which the full faith, credit and taxing power of the State of South Carolina are not pledged. These bonds and notes and the purposes for which they have been issued are described below.

*In the opinion of Bond Counsel, interest on the Bonds of Series I and Series J is exempt from federal income taxation under existing statutes, regulations, rulings, and court decisions and the Bonds of Series I and Series J and the interest thereon are exempt from taxation under the laws of South Carolina except as to inheritance, estate or transfer taxes. See "Tax Exemption" herein.*

NEW ISSUES

# CLEMSON UNIVERSITY, SOUTH CAROLINA

## $3,100,000

## STUDENT AND FACULTY HOUSING REFUNDING REVENUE BONDS, SERIES I

### AND

## $10,240,000

## STUDENT AND FACULTY HOUSING REVENUE BONDS, SERIES J

The Bonds of Series I and Series J will be dated December 1, 1982. Principal and interest (January 1 and July 1; first coupon July 1, 1983) are payable in the amounts and at the annual rates shown below, at the principal office of Manufacturers Hanover Trust Company in the City of New York, State of New York. The Bonds of Series I and Series J are issuable as coupon bonds in the denomination of $5,000 and are registrable as to principal only as provided in the Bond Resolution of the Board of Trustees of Clemson University which authorized the issuance of the Bonds of Series I and Series J.

The Bonds of Series I and Series J are subject to redemption prior to maturity as described herein.

The Bonds of Series I are being issued to refund three (3) series of outstanding Student and Faculty Housing Revenue Bonds of Clemson University, as more fully described herein. The Bonds of Series J are being issued to provide funds with which to pay the principal of the $5,300,000 Bond Anticipation Notes of Clemson University, maturing April 1, 1983 and to defray the cost of constructing additional Student and Faculty Housing Facilities for Clemson University, South Carolina.

The Bonds of Series I and Series J do not constitute an indebtedness of the State of South Carolina within the meaning of any provision, limitation or restriction of the Constitution or Laws of the State of South Carolina. The Bonds of Series I and Series J are payable solely from the revenues derived by Clemson University from the Student and Faculty Housing Facilities, as such are defined in the Bond Resolution.

### $3,100,000 Series I

| Due July 1 | Amount | Rate | Price | Due July 1 | Amount | Rate | Price |
|------------|--------|------|-------|------------|--------|------|-------|
| 1984 | $ 65,000 | 6.25% | 100% | 1990 | $100,000 | 8.25% | 100% |
| 1985 | 70,000 | 6.75 | 100 | 1991 | 105,000 | 8.60 | 100 |
| 1986 | 75,000 | 7.25 | 100 | 1992 | 115,000 | 8.90 | 100 |
| 1987 | 80,000 | 7.50 | 100 | 1993 | 125,000 | 9.25 | 100 |
| 1988 | 85,000 | 7.75 | 100 | 1994 | 135,000 | 9.50 | 100 |
| 1989 | 90,000 | 8.00 | 100 | 1995 | 150,000 | 9.75 | 100 |

$1,905,000 10.4% Term Bonds Due July 1, 2003—Price—100%
(Accrued interest to be added from December 1, 1982)

### $10,240,000 Series J

| Due July 1 | Amount | Rate | Price | Due July 1 | Amount | Rate | Price |
|------------|--------|------|-------|------------|--------|------|-------|
| 1984 | $250,000 | 6.25% | 100% | 1990 | $500,000 | 8.25% | 100% |
| 1985 | 300,000 | 6.75 | 100 | 1991 | 550,000 | 8.60 | 100 |
| 1986 | 350,000 | 7.25 | 100 | 1992 | 600,000 | 8.90 | 100 |
| 1987 | 375,000 | 7.50 | 100 | 1993 | 650,000 | 9.25 | 100 |
| 1988 | 400,000 | 7.75 | 100 | 1994 | 675,000 | 9.50 | 100 |
| 1989 | 450,000 | 8.00 | 100 | 1995 | 700,000 | 9.75 | 100 |

$4,440,000 10.4% Term Bonds Due July 1, 2003—Price—100%
(Accrued interest to be added from December 1, 1982)

*The Bonds of Series I and Series J are offered when, as and if issued and received by the Underwriters, subject to the unqualified approval of legality by Sinkler Gibbs & Simons, Columbia, South Carolina. Bond Counsel. It is expected that the Bonds of Series I and Series J, in definitive form, will be available for delivery in New York, New York, on or about December 23, 1982.*

| | |
|---|---|
| **Bankers Trust of South Carolina** | **First National Bank of South Carolina** |
| **The Citizens and Southern National Bank of South Carolina** | **The South Carolina National Bank** |

December 17, 1982



## Security for the Bonds of Series I and Series J

The faith and credit of the State of South Carolina are not pledged to the payment of the principal of or interest on the Bonds of Series I and Series J.

The Resolution of 1978 provides that the Entire Revenues and all Loan Subsidies, as such terms are defined in the Resolution of 1978, are irrevocably pledged to the payment of all Bonds issued pursuant thereto. The Entire Revenues consist of the entire rental revenues derived by Clemson from the operation of the Facilities of Clemson. The Resolution of 1978 defines the Facilities to include all dormitories, student dwelling quarters and facilities, houses, residences, apartment buildings, from time to time used or designed for use as student and faculty housing, and all furniture, furnishings and equipment therein, which are now owned by Clemson, or which may thereafter be acquired by Clemson for any of such purposes, and which are used in connection with the main campus of Clemson, in Clemson, South Carolina. Loan Subsidies are defined as all sums to become payable to or for the account of Clemson pursuant to any grant, loan agreement, contract or other obligation obligating either the United States or any department or agency thereof, or the State of South Carolina to make payments over a period of years for the purpose of discharging in whole or in part the Student and Faculty Housing Revenue Bonds.

Section 3.15 of the Resolution of 1978 further provides that the pledge of these revenues for any Fiscal Year is deemed discharged if all installments of principal and interest on all Bonds issued pursuant to Act No. 456 then outstanding matured or maturing in such Fiscal Year shall have been fully paid and discharged and Clemson shall have made all other payments required of it by the Resolution of 1978. In addition to the establishment and funding of a Debt Service Fund which is intended to provide funds to meet the principal and interest payments on the Bonds as they respectively mature, there is also established a Debt Service Reserve Fund. This latter fund is intended to provide a cushion or reserve to meet the payment of installments of principal and interest of the Bonds but is only to be resorted to in the event funds in the Debt Service Fund are inadequate for such purpose. All Bonds issued pursuant to the authorization of Act No. 456, including the Bonds of Series I and Series J and those offered in the future, are intended to be on a parity and equally and ratably secured by the pledge of the Entire Revenues and Loan Subsidies, as well as the statutory lien, covenants and remedies provided by the Resolution of 1978.

## Provisions for Issuing Additional Parity Bonds

Pursuant to the provisions of Article IV of the Resolution of 1978, the Board of Trustees of Clemson specifically reserved the right to issue Additional Bonds and provided that if the Additional Bonds were issued in accordance with each of the conditions imposed by Article IV, then such Additional Bonds would be on a parity with all the Bonds issued pursuant to the Resolution of 1978. The conditions imposed by Article IV consist of the following requirements:

1. The principal proceeds of such Additional Bonds shall be used either:

(a) to provide funds to refund Bonds issued pursuant to the authorizations of Act No. 456 and then outstanding; or

(b) to provide funds to pay the cost of constructing additional Facilities, or to renovate existing Facilities.

2. Clemson shall, on the occasion of the issuance of such Additional Bonds, be in full compliance with all of the covenants, undertakings and agreements made by it in the Resolution of 1978 as then amended or supplemented and such fact shall be established by a certificate of the Chief Financial Officer of Clemson.

3. The Entire Revenues for the Fiscal Year next preceding the Fiscal Year in which the Additional Bonds shall be issued, as established by an Accountant's Certificate, shall be not less than one hundred forty per centum (140%) of:

4

*In the opinion of Bond Counsel, interest on the Bonds of Series I and Series J is exempt from federal income taxation under existing statutes, regulations, rulings, and court decisions and the Bonds of Series I and Series J and the interest thereon are exempt from taxation under the laws of South Carolina except as to inheritance, estate or transfer taxes. See "Tax Exemption" herein.*

NEW ISSUES

# CLEMSON UNIVERSITY, SOUTH CAROLINA

## $3,100,000

## STUDENT AND FACULTY HOUSING REFUNDING REVENUE BONDS, SERIES I

### *AND*

## $10,240,000

## STUDENT AND FACULTY HOUSING REVENUE BONDS, SERIES J

The Bonds of Series I and Series J will be dated December 1, 1982. Principal and interest (January 1 and July 1; first coupon July 1, 1983) are payable in the amounts and at the annual rates shown below, at the principal office of Manufacturers Hanover Trust Company in the City of New York, State of New York. The Bonds of Series I and Series J are issuable as coupon bonds in the denomination of $5,000 and are registrable as to principal only as provided in the Bond Resolution of the Board of Trustees of Clemson University which authorized the issuance of the Bonds of Series I and Series J.

The Bonds of Series I and Series J are subject to redemption prior to maturity as described herein.

The Bonds of Series I are being issued to refund three (3) series of outstanding Student and Faculty Housing Revenue Bonds of Clemson University, as more fully described herein. The Bonds of Series J are being issued to provide funds with which to pay the principal of the $5,300,000 Bond Anticipation Notes of Clemson University, maturing April 1, 1983 and to defray the cost of constructing additional Student and Faculty Housing Facilities for Clemson University, South Carolina.

The Bonds of Series I and Series J do not constitute an indebtedness of the State of South Carolina within the meaning of any provision, limitation or restriction of the Constitution or Laws of the State of South Carolina. The Bonds of Series I and Series J are payable solely from the revenues derived by Clemson University from the Student and Faculty Housing Facilities, as such are defined in the Bond Resolution.

### $3,100,000 Series I

| Due July 1 | Amount | Rate | Price | Due July 1 | Amount | Rate | Price |
|---|---|---|---|---|---|---|---|
| 1984 | $ 65,000 | 6.25% | 100% | 1990 | $100,000 | 8.25% | 100% |
| 1985 | 70,000 | 6.75 | 100 | 1991 | 105,000 | 8.60 | 100 |
| 1986 | 75,000 | 7.25 | 100 | 1992 | 115,000 | 8.90 | 100 |
| 1987 | 80,000 | 7.50 | 100 | 1993 | 125,000 | 9.25 | 100 |
| 1988 | 85,000 | 7.75 | 100 | 1994 | 135,000 | 9.50 | 100 |
| 1989 | 90,000 | 8.00 | 100 | 1995 | 150,000 | 9.75 | 100 |

$1,905,000 10.4% Term Bonds Due July 1, 2003—Price—100%
(Accrued interest to be added from December 1, 1982)

### $10,240,000 Series J

| Due July 1 | Amount | Rate | Price | Due July 1 | Amount | Rate | Price |
|---|---|---|---|---|---|---|---|
| 1984 | $250,000 | 6.25% | 100% | 1990 | $500,000 | 8.25% | 100% |
| 1985 | 300,000 | 6.75 | 100 | 1991 | 550,000 | 8.60 | 100 |
| 1986 | 350,000 | 7.25 | 100 | 1992 | 600,000 | 8.90 | 100 |
| 1987 | 375,000 | 7.50 | 100 | 1993 | 650,000 | 9.25 | 100 |
| 1988 | 400,000 | 7.75 | 100 | 1994 | 675,000 | 9.50 | 100 |
| 1989 | 450,000 | 8.00 | 100 | 1995 | 700,000 | 9.75 | 100 |

$4,440,000 10.4% Term Bonds Due July 1, 2003—Price—100%
(Accrued interest to be added from December 1, 1982)

*The Bonds of Series I and Series J are offered when, as and if issued and received by the Underwriters, subject to the unqualified approval of legality by Sinkler Gibbs & Simons, Columbia, South Carolina. Bond Counsel. It is expected that the Bonds of Series I and Series J, in definitive form, will be available for delivery in New York, New York, on or about December 23, 1982.*

| | |
|---|---|
| **Bankers Trust of South Carolina** | **First National Bank of South Carolina** |
| **The Citizens and Southern National Bank of South Carolina** | **The South Carolina National Bank** |

December 17, 1982

 

(b) *Refunded Bonds* shall mean the outstanding Bonds of Series C, Series F and Series G, which as of December 1, 1982, are in the aggregate principal amount of $4,870,000;

(c) *Regulations* shall mean the regulations adopted by the Treasury Department of the United States of America pursuant to Section 103(c) of the Internal Revenue Code of 1954, as amended; and

(d) *SLGS* shall mean direct obligations of the United States of America issued in book entry form, none of which are subject to redemption, prior to maturity at the option of the obligor;

Pursuant to the provisions of Section 4.06 of the Supplemental Resolution, a portion of the proceeds of the Bonds of Series I are to be delivered to the Escrow Holder under the Escrow Deposit Agreement and disposed of by the Escrow Holder for the acquisition of SLGS in order to provide for the defeasance of the Refunded Bonds. The Escrow Deposit Agreement will become effective between Clemson and the Escrow Holder on the date of the issuance and delivery of the Bonds of Series I. Under the Escrow Deposit Agreement, provision for the payment in full of the Refunded Bonds will be made through the establishment of an Escrow Deposit Fund from which payment of all Refunded Bonds and the interest due thereon will be made as the same become due and payable.

In addition to a portion of the proceeds of the Bonds of Series I, Clemson will deposit with the Escrow Holder in such Escrow Deposit Fund, additional moneys with which to purchase obligations of the United States or agencies thereof, the principal of and the interest on which when due and payable and received by the Escrow Holder, together with the sums realized from the SLGS purchased with a portion of the proceeds of the Bonds of Series I, will provide moneys sufficient to pay the principal of and interest to become due on the Refunded Bonds. Upon the execution and delivery of the Escrow Deposit Agreement, and the simultaneous funding of the Escrow Deposit Fund, the Refunded Bonds shall be deemed paid and consequently, the rights granted to the holders of the Refunded Bonds will have ceased, determined and become void, except for the right to the payment of the Refunded Bonds and the interest thereon and certain other rights with respect to the registration of the Refunded Bonds and the replacement thereof upon loss, destruction or mutilation thereof.

## DEBT OF CLEMSON UNIVERSITY

### Outstanding Debt Held by Public

State Institution Bonds have been issued on behalf of Clemson, which, outstanding as of November 1, 1982, amounted to $9,350,000. State Institution Bonds are general obligations of the State of South Carolina and are issued pursuant to Chapter 107, Title 59, Code of Laws of South Carolina, 1976, as amended (the State Institution Bond Act). Bonds may be issued pursuant to the State Institution Bond Act for the benefit of certain State supported institutions of higher learning for the purpose of obtaining permanent improvements for such institutions, and to defray the cost of acquiring or improving land for such improvements. They are secured by a pledge of the full faith, credit and taxing power of the State of South Carolina and, in addition, by a pledge of the tuition and matriculation fees collected by the institution.

Act No. 1009 of the Acts and Joint Resolutions of the General Assembly of South Carolina for the year 1962, as amended, authorized Clemson to issue bonds for the purpose of providing funds to defray a portion of the cost of constructing and equipping a new library on the Clemson campus. Pursuant to said Act, Clemson issued $1,500,000 Library Bonds of Clemson University in 1965. The bonds are payable solely from the revenues derived from a Special Student Fee imposed by Clemson upon all students now or hereafter in attendance at any regular semester or summer school session

14

of Clemson. As of November 1, 1982, there were outstanding $480,000 of Library Bonds. Applicable to the payment of the principal and interest on these Library Bonds, there is presently on deposit in a special fund the sum of $583,648.

In 1978, Clemson issued $4,250,000 Stadium Improvement Bonds, Series of 1978, of Clemson University, the proceeds of which were utilized to meet the cost of the third major addition and renovation to Memorial Stadium. These bonds, which were issued pursuant to the authorizations contained in Act No. 1277 of the Acts and Joint Resolutions of the General Assembly of the State of South Carolina for the year 1970, as amended, are payable from the entire revenues derived from the imposition and collection of an Admission Fee and a Special Student Fee as such terms are defined in Act No. 1277. As of November 1, 1982, there were outstanding $3,725,000 of Stadium Improvement Bonds.

In January of 1979, Clemson issued $2,400,000 Plant Improvement Bonds, Series of 1978, of Clemson University, the proceeds of which were utilized to provide funds to pay a portion of the cost of the construction of new facilities and improvements to existing facilities and all necessary equipment therefor. These bonds, which were issued pursuant to the authorization contained in Act No. 1278 of the Acts and Joint Resolutions of the General Assembly of the State of South Carolina for the year 1970, as amended, are payable from the entire revenues derived by Clemson from the imposition of the Plant Improvement Fee, which is a special student fee defined in Act No. 1278. As of November 1, 1982, there were outstanding $2,130,000 of Plant Improvement Bonds.

The following tables provide the debt service requirements on the outstanding indebtedness of Clemson above described.

### TABLE SHOWING DEBT SERVICE REQUIREMENTS OF
### STATE INSTITUTION BONDS OF CLEMSON UNIVERSITY(1)

| Fiscal Year Ending 6/30 | Principal Due | Interest Due | Total |
|---|---|---|---|
| 1983 | $ 400,000 | $ 456,700.00 | $ 856,700.00 |
| 1984 | 450,000 | 435,325.00 | 885,325.00 |
| 1985 | 450,000 | 413,325.00 | 863,325.00 |
| 1986 | 550,000 | 388,925.00 | 938,925.00 |
| 1987 | 650,000 | 360,200.00 | 1,010,200.00 |
| 1988 | 650,000 | 329,362.50 | 979,362.50 |
| 1989 | 750,000 | 295,725.00 | 1,045,725.00 |
| 1990 | 750,000 | 259,350.00 | 1,009,350.00 |
| 1991 | 850,000 | 220,175.00 | 1,070,175.00 |
| 1992 | 850,000 | 178,025.00 | 1,028,025.00 |
| 1993 | 700,000 | 138,600.00 | 838,600.00 |
| 1994 | 700,000 | 102,200.00 | 802,200.00 |
| 1995 | 800,000 | 63,000.00 | 863,000.00 |
| 1996 | 800,000 | 21,000.00 | 821,000.00 |
| | $9,350,000 | $3,661,912.50 | $13,011,912.50 |

(1) The figures provided in this table do not include State Institution Bonds for Clemson University which have been defeased.

15

3

Mail the bill and the student directory along with your payment and/or the deferred payment note, if applicable, to the University in the enclosed envelope. Payment can be made in the form of check, money order or credit card for the total amount due. We must receive it by August 4, 1987 for it to be processed as an advance payment. No advance payments will be processed after that date. All advance payments received after that date will be held and can be picked up on registration day at the "Late Arrival Checks" station in Sikes Hall.

**********************************************************************************************************

### Schedule of Semester Charges
### Academic Year 1987-1988

| | | Resident* | Non Resident |
|---|---|---|---|
| **Full-Time Fees:** | Tuition | $ 25.00 | $ 100.00 |
| | Matriculation Fee | 5.00 | 5.00 |
| | University Fee | 935.00 | 2,380.00 |
| | TOTAL ACADEMIC FEES | $ 965.00 | $ 2,485.00 |
| **Part-Time Fees:** | Tuition | $ 2.00/hr. | $ 8.00/hr. |
| | Matriculation Fee | 5.00 | 5.00 |
| | University Fee | 72.00/hr. | 178.00/hr. |
| | TOTAL ACADEMIC FEES | $ 75.00/hr.† | $ 187.00/hr.† |
| **Audit Fees:** | Tuition | $ 1.00/hr. | $ 4.00/hr. |
| | University Fee | 36.00/hr. | 89.00/hr. |
| | TOTAL ACADEMIC FEES | $ 37.00/hr.† | $ 93.00/hr.† |
| **Staff Fees:** | Tuition | $ 1.00/hr. | |
| | Matriculation Fee | 5.00 | |
| | University Fee | 36.00/hr. | |
| | TOTAL ACADEMIC FEES | $ 38.00/hr.† | |

| | | |
|---|---|---|
| **Graduate Assistant Fee** | | $ 300.00 |
| **Medical Fee** (Must be paid by all Full Time Students) | | $ 80.00 |
| **Laboratory Fee** (Nonrefundable after last day to add) | | $ 10.00/Each Lab |
| **University Housing:** | Johnstone Hall (Except Annex A & F) | $ 515.00 |
| | Bowen, Bradley, Donaldson, Norris, Wannamaker, Johnstone – Annex A & F, Cope, Benet, Geer, Sanders, and Young Halls | 550.00 |
| | Lever, Mauldin, Barnett, Manning, Byrnes, and Smith Halls | 610.00 |
| | Clemson House (room) | 620.00 |
| | Clemson House (kitchenette) | 645.00 |
| | Thornhill Village | 680.00 |
| | Calhoun Courts Apartments | 770.00 |
| | Temporary Housing | 405.00 |
| **Board:** | Lunch Plan (5 lunches), Monday thru Friday | $ 268.00 |
| | Five-Day Plan (15 meals), Monday thru Friday | 520.00 |
| | Seven-Day Plan (21 meals) Monday thru Sunday | 600.00 |
| **Vehicle Registration** | first vehicle | $ 12.00 |
| | second vehicle | N/C |
| **TAPS (Yearbook)** | per copy | $ 20.00 |
| **Student Insurance:** | S – Student Only | $ 125.00 |
| | SS – Student and Spouse | 267.00 |
| Policy Period | SSC – Student, Spouse, and Children | 404.00 |
| 8/15/87 – 8/15/88 | SC – Student and Children | 266.00 |

*All graduate students pay resident fees.
†The rates for Part-time and Staff fees will reflect a consolidation of the three fee types into an Academic Fee per hour beginning with the Spring, 1987 Semester.

Citation                              Rank(R)         Page(P)         Database        Mode
OPINION NO. 78-16                     R 1 OF 1        P 1 OF 6        SC-AG           T
  SC-AG Jan. 27, 1978

  SC
  TO: Board of Trustees
  c/o Dr. M. M. Nance, Jr., President
  South Carolina State College

  January 27, 1978

  QUESTIONS:

                                        I.


  Does the Commission on Higher Education have the authority to direct use of
  university or college fees levied by the institution's board of trustees upon
  students for specific programs and activities?

                                        II.


  Does the Commission have the authority to require institutions to increase or
  decrease such fees?

OPINION NO. 78-16                  R 1 OF 1           P 2 OF 6           SC-AG           P


  STATUTES, CASES, ETC.

  S.C. Code Ann. s 59-103-10, et seq. (1976);
  1977 S.C. Acts and Joint Resolutions, Act No. 219, s 122-23;
  Lewis v. Gaddy, 254 S.C. 66, 173 S.E.2d 376, 378 (1970).

  DISCUSSION:

  The Commission on Higher Education is established pursuant to S.C. Code Ann. s
  59-103-10, et seq. (1976). The statutory scheme, read as a whole, envisions an
  independent commission charged with responsibility of coordinating the overall
  efforts of the State's institutions of higher learning in serving the
  educational needs of the state. See S.C. Code Ann. s 59-103-20 (1976). The
  Commission on Higher Education is also charged with the responsibility of
  coordinating all budgetary requests made by the State-supported institutions of
  higher learning.
  All State supported institutions of higher learning shall submit their
  budgets to the Commission for approval, which shall in turn make budgetary
  presentations to the State Budget & Control Board and the General Assembly (or
  any committee thereof) on behalf of all the institutions.

OPINION NO. 78-16                  R 1 OF 1           P 3 OF 6           SC-AG           P

  S.C. Code Ann. s 59-103-30 (1976).
  These budgetary responsibilities are also elaborated upon in S.C. Code Ann. s
  59-103-60 (1976) which, in part, states:
  The Commission shall review the annual budgets of the State-supported
  institutions of higher learning and shall make such recommendations to the
  State Budget & Control Board and the General Assembly concerning these budgets
  as may be considered desirable, and shall make such further recommendations
  from time to time to the State Budget & Control Board as the Commission may
  deem in the interest of the improving higher education in the state.
  Although the Commission's supervisory authority is broad, the General Assembly
  has set certain limitations as to its control over the specific budgets, and
  use of funds comprising those budgets, of the various institutions of higher
  learning. S.C. Code Ann. s 59-103-30(b) states:

be submitted to the Commission. If the Commission does not concur in such
requests, the institution of higher learning may request a hearing on such
requests before appropriate committees of the General Assembly.
  As to specific fees charged by the various institutions of higher learning,
which generate certain revenues for the overall budget of the respective
institutions, the General Assembly through the Appropriations Act has
designated that student fees will be set by the board of trustees of the

OPINION NO. 78-16          R 1 OF 1         P 4 OF 6         SC-AG        P

respective institutions at the direction of the General Assembly. In 1977-78
Appropriations Act, 1977 S.C. Acts & Joint Resolutions, Act No. 219, s 122, it
is stated that the board of trustees of the respective institutions shall fix
fees applicable to academic and general maintenance and operation costs 'at
rates no less than those prevailing in the year 1976-77'; and that fees set by
the board of trustees applicable to dormitory rental, dining halls, laundry,
infirmary and all other personal subsistence expenses 'shall be sufficient to
fully cover the cost of providing such facilities and services'. This same
section also states:
  Student activity fees may be fixed at such rates as the respective boards
shall deem reasonable and necessary.
  Section 123 of the Appropriations Act also establishes the manner in which
fees shall be charged by stating:
  No such fee or income shall be charged in excess of the amount that is
necessary to supply the service, or fulfill the purpose for which such fee or
income was charged.
This same section also provides in conclusion:
  (F)unds at State institutions of higher learning derived wholly from athletic
or other student contests, from the activities of student organizations, and
from the operations of canteens and book stores, may be retained at the
institution and used as determined by the respective governing boards and may

OPINION NO. 78-16          R 1 OF 1         P 5 OF 6         SC-AG        P

be audited annually by the state.
  As a matter of statutory construction, statutes in pari materia (on the same
subject must be construed together and reconciled, if possible, so as to render
both operative. See Lewis vs. Gaddy, 254 S.C. 66, 173 S.E.2d 376, 378 (1970).
Looking at those statutes setting forth the general authority of the Commission
on Higher Education, and at those laws controlling the authority for fixing
student fees at the respective institutions of higher learning, it is
reasonable to conclude that the Commission on Higher Education is granted the
authority to coordinate the overall budgetary presentation, and provide
equitable and effective allocation of funds among the respective institutions,
presenting the final budgetary request to the General Assembly for the State-
wise funding of these programs of higher education. But the Commission on
Higher Education cannot direct the specific use of student fees at any State
institution of higher learning, where use and amounts of such student funds are
mandated by the General Assembly or control is delegated to the boards of
trustees of the various State institutions of higher learning. Nor can the
Commission on Higher Education direct any institution of higher learning to
increase or decrease such fees where the level of such fees is mandated by
statute, or the authority to set the fees is vested in the board of trustees of
the respective institutions.

*In the opinion of Bond Counsel, interest on the Bonds of Series I and Series J is exempt from federal income taxation under existing statutes, regulations, rulings, and court decisions and the Bonds of Series I and Series J and the interest thereon are exempt from taxation under the laws of South Carolina except as to inheritance, estate or transfer taxes. See "Tax Exemption" herein.*

<u>NEW ISSUES</u>

# CLEMSON UNIVERSITY, SOUTH CAROLINA

## $3,100,000

## STUDENT AND FACULTY HOUSING REFUNDING REVENUE BONDS, SERIES I

### *AND*

## $10,240,000

## STUDENT AND FACULTY HOUSING REVENUE BONDS, SERIES J

The Bonds of Series I and Series J will be dated December 1, 1982. Principal and interest (January 1 and July 1; first coupon July 1, 1983) are payable in the amounts and at the annual rates shown below, at the principal office of Manufacturers Hanover Trust Company in the City of New York, State of New York. The Bonds of Series I and Series J are issuable as coupon bonds in the denomination of $5,000 and are registrable as to principal only as provided in the Bond Resolution of the Board of Trustees of Clemson University which authorized the issuance of the Bonds of Series I and Series J.

The Bonds of Series I and Series J are subject to redemption prior to maturity as described herein.

The Bonds of Series I are being issued to refund three (3) series of outstanding Student and Faculty Housing Revenue Bonds of Clemson University, as more fully described herein. The Bonds of Series J are being issued to provide funds with which to pay the principal of the $5,300,000 Bond Anticipation Notes of Clemson University, maturing April 1, 1983 and to defray the cost of constructing additional Student and Faculty Housing Facilities for Clemson University, South Carolina.

The Bonds of Series I and Series J do not constitute an indebtedness of the State of South Carolina within the meaning of any provision, limitation or restriction of the Constitution or Laws of the State of South Carolina. The Bonds of Series I and Series J are payable solely from the revenues derived by Clemson University from the Student and Faculty Housing Facilities, as such are defined in the Bond Resolution.

### $3,100,000 Series I

| Due July 1 | Amount | Rate | Price | Due July 1 | Amount | Rate | Price |
|---|---|---|---|---|---|---|---|
| 1984 | $ 65,000 | 6.25% | 100% | 1990 | $100,000 | 8.25% | 100% |
| 1985 | 70,000 | 6.75 | .100 | 1991 | 105,000 | 8.60 | 100 |
| 1986 | 75,000 | 7.25 | 100 | 1992 | 115,000 | 8.90 | 100 |
| 1987 | 80,000 | 7.50 | 100 | 1993 | 125,000 | 9.25 | 100 |
| 1988 | 85,000 | 7.75 | 100 | 1994 | 135,000 | 9.50 | 100 |
| 1989 | 90,000 | 8.00 | 100 | 1995 | 150,000 | 9.75 | 100 |

**$1,905,000 10.4% Term Bonds Due July 1, 2003—Price—100%**

(Accrued interest to be added from December 1, 1982)

### $10,240,000 Series J

| Due July 1 | Amount | Rate | Price | Due July 1 | Amount | Rate | Price |
|---|---|---|---|---|---|---|---|
| 1984 | $250,000 | 6.25% | 100% | 1990 | $500,000 | 8.25% | 100% |
| 1985 | 300,000 | 6.75 | 100 | 1991 | 550,000 | 8.60 | 100 |
| 1986 | 350,000 | 7.25 | 100 | 1992 | 600,000 | 8.90 | 100 |
| 1987 | 375,000 | 7.50 | 100 | 1993 | 650,000 | 9.25 | 100 |
| 1988 | 400,000 | 7.75 | 100 | 1994 | 675,000 | 9.50 | 100 |
| 1989 | 450,000 | 8.00 | 100 | 1995 | 700,000 | 9.75 | 100 |

**$4,440,000 10.4% Term Bonds Due July 1, 2003—Price—100%**

(Accrued interest to be added from December 1, 1982)

*The Bonds of Series I and Series J are offered when, as and if issued and received by the Underwriters, subject to the unqualified approval of legality by Sinkler Gibbs & Simons, Columbia, South Carolina, Bond Counsel. It is expected that the Bonds of Series I and Series J, in definitive form, will be available for delivery in New York, New York, on or about December 23, 1982.*

**Bankers Trust of South Carolina**
**The Citizens and Southern National Bank of South Carolina**

**First National Bank of South Carolina**
**The South Carolina National Bank**

December 17, 1982

## TABLE SHOWING DEBT SERVICE REQUIREMENTS OF
## PLANT IMPROVEMENT BONDS OF CLEMSON UNIVERSITY

| Fiscal Year Ending 6/30 | Principal | Interest | Total |
|---|---|---|---|
| 1983 | $ 90,000 | $ 136,680 | $ 226,680 |
| 1984 | 110,000 | 130,605 | 240,605 |
| 1985 | 110,000 | 123,180 | 233,180 |
| 1986 | 110,000 | 115,755 | 225,755 |
| 1987 | 110,000 | 108,330 | 218,330 |
| 1988 | 110,000 | 100,905 | 210,905 |
| 1989 | 130,000 | 93,480 | 223,480 |
| 1990 | 130,000 | 84,900 | 214,900 |
| 1991 | 130,000 | 76,450 | 206,450 |
| 1992 | 130,000 | 68,000 | 198,000 |
| 1993 | 130,000 | 59,550 | 189,550 |
| 1994 | 140,000 | 51,100 | 191,100 |
| 1995 | 140,000 | 42,000 | 182,000 |
| 1996 | 140,000 | 32,900 | 172,900 |
| 1997 | 140,000 | 23,800 | 163,800 |
| 1998 | 140,000 | 14,700 | 154,700 |
| 1999 | 140,000 | 7,350 | 147,350 |
| | $2,130,000 | $1,269,685 | $3,399,685 |

**Other Debt**

In addition to the debt tabulated on pages 15 through 17, inclusive, Clemson is indebted to the State of South Carolina for moneys advanced by the State for the construction of a multi-purpose auditorium. Pursuant to the authorization of Act No. 491 of 1965 (Act No. 491), the State of South Carolina issued notes on behalf of Clemson, the proceeds of which were utilized by Clemson to construct a multi-purpose auditorium and facilities to benefit varied types of student activities. Sections 5 and 6 of Act No. 491 required, as a condition precedent to the issuance of the notes by the State of South Carolina, that the Trustees impose an Admission Fee, which is an added charge to all admission fees in excess of $.50, upon all performances, contests or events which take place in the facilities constructed pursuant to Act No. 491 and a Special Student Fee in the amount of $2.50 per semester upon all students enrolled and attending classes or courses at Clemson. Presently, the Admission Fee is $.25 per person for each performance or event. The Admission Fee and the Special Student Fee are required to remain in effect for so long a time as shall be required in order to repay in full all sums paid by the State of South Carolina by way of principal and interest upon the notes issued pursuant to Act No. 491. Thus, although these notes issued by the State of South Carolina were refunded in 1972 with the proceeds of State Capital Improvement Bonds, the obligation to impose and collect the Admission Fee and the Special Student Fee required by Act No. 491 continues until the debt of Clemson to the State is repaid. As of November 1, 1982, the debt amounted to $862,700.78. It bears interest at the average rate borne by the State Capital Improvement Bonds whose proceeds refunded the original notes. This rate is 4.12648%. The State Auditor's Office advises that it does not regard this obligation as direct debt of Clemson but rather, debt of the State itself (now in the form of State Capital Improvement Bonds) repayable from the Special Student Fee and the Admission Fee prescribed by Act No. 491. This debt is not reflected in the balance sheet of Clemson.

**Debt History**

There has been no default in the payment of principal or interest on any bonds issued by or on behalf of Clemson University. Clemson has never borrowed for the purpose of refunding any bonds

17

privately issued in order to prevent a default, nor has Clemson borrowed for the purpose of paying the cost of operation or for funding a deficit.

**Anticipated Capital Needs**

In addition to the issuance of the Bonds of Series I and Series J, Clemson will borrow approximately $10 Million in medium term notes to finance the expansion and renovation of the football stadium at a total cost approximating $15 Million and will be paid entirely from Athletic Department revenues and surplus IPTAY contributions.

Presently, Clemson anticipates acquiring additional computer equipment pursuant to the terms of an installment purchase agreement. Pursuant to the terms of the agreement, it is anticipated that Clemson will pay approximately $5.2 Million over a four year period; these payments will be paid from current unrestricted funds.

## CLEMSON UNIVERSITY AND ITS OPERATIONS

**Tuition and Fees**

Four categories of payments are made to Clemson University by full-time students in attendance at regular sessions. Those persons enrolled pay Tuition, the Matriculation Fee, the University Fee and the Health Fee at the commencement of each semester of the academic year. The tuition and matriculation fees are both pledged to the payment of the State Institution Bonds issued on behalf of Clemson.

The University Fee, which is likewise paid on a semester basis, is comprised of a fee charged for the current operations of Clemson and the various special student fees imposed by Clemson pursuant to specific statutory authorizations. Each of the special student fees, with the exception of the Student Fee for Plant Maintenance, Repair and Renovations, is imposed to service indebtedness incurred by Clemson or incurred on behalf of Clemson. With the exception of the special student fee imposed to service the indebtedness incurred in connection with a loan heretofore discussed under the heading "Other Debt," made by the State of South Carolina to Clemson to enable it to construct a multi-purpose auditorium in 1967 and the amount of which is established by specific provision of the statute authorizing its imposition, each special student fee is monitored on a quarterly basis to insure that adequate moneys are available to meet the principal and interest payments due on the bonds secured by such fees. The Vice President for Business and Finance recommends to the Trustees the amount of the University Fee to be imposed for each academic year. Subsequently, the Trustees at their annual budget meeting, which occurs at the commencement of each Fiscal Year, sets the amount of the University Fee to be charged for the upcoming academic year. Provision is made to permit the Vice President for Business and Finance to allocate the total amount collected from the University Fee among the debt service funds which have been established for the various issues.

During academic year 1982-83, the portion of the University Fee imposed to service debt of Clemson amounts to $31.00 per regular session, full-time student. The following tables indicate the amounts of tuition and fees collected from resident and non-resident, part-time and full-time students enrolled during regular sessions for academic years 1973-74 to 1982-83, and the anticipated amounts of tuition and fees which will be collected for academic year 1983-84.

18